**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WITHIDA BIHAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALIBABA GROUP HOLDING LIMITED, and EDDIE YONGMING WU,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Withida Bihan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Alibaba Group Holding Limited ("Alibaba" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Alibaba securities between May 23, 2024 and November 11, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by

Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"). [1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Alibaba securities during the Class Period and was economically damaged thereby.

---

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

7. Defendant Alibaba is a Chinese multinational technology company specializing in e-commerce, retail, Internet, and technology.

8. Alibaba is incorporated in the Cayman Islands. Its principal place of business is located at 26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong S.A.R., People's Republic of China. Alibaba's agent for service in the United States is Corporation Service Company located at 19 West 44th Street, Suite 200, New York, NY 10036. Alibaba's American Depositary Shares ("ADSs") trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BABA".

9. Defendant Eddie Yongming Wu ("Wu") served as the Company's Chief Executive Officer ("CEO") at all relevant times.

10. Defendants Wu is also referred to herein as the "Individual Defendant."

11. The Individual Defendant:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. Alibaba is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Alibaba under *respondeat superior* and agency principles.

14. Defendant Alibaba and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

15. On May 23, 2024, Alibaba filed its Annual Report on Form 20-F for the year ended March 31, 2024 (the "2024 Annual Report"). Attached to the 2024 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Wu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

16. The 2024 Annual Report contained the following risk disclosure:

> ***Export control, economic or trade sanctions and a heightened trend towards trade and technology "de-coupling" and "de-risking" could negatively affect our business operations and subject us to regulatory investigations, fines, penalties or other actions and reputational harm, which could materially and adversely affect our competitiveness and business operations, as well as the trading prices of our ADSs, Shares and/or other securities.***

The United Nations and a number of countries and jurisdictions, including China, the United States and the EU, have adopted various export control and economic or trade sanction regimes. In particular, the U.S. government and other governments have increasingly threatened and/or imposed export control, economic, trade and other sanctions, trade embargoes, investment prohibitions or restriction and other heightened regulatory requirements on a number of China-based companies through various entity or sanction lists or other manners for a number of reasons, such as engagement or involvement in sale, transfer or development of cutting-edge or emerging technologies, "dual-use" commercial technologies, advanced computing chips or in other activities that could be used for surveillance, military or adversarial purposes or otherwise harm or threaten such jurisdictions' national security or interests. It is possible that the United States or other jurisdictions may further impose, or threaten to impose similar or heightened measures against more China-based companies including us for similar or other reasons. ***These regulatory measures and requirements could (1) prohibit or restrict firms from selling, exporting, re-exporting or transferring certain technology, components, software and other items to China-based companies, (2) prohibit or restrict persons from entering into transactions with China-based companies, or (3) prohibit or restrict China-based companies from acquiring advanced computing chips, accessing, transferring or storing data, providing services in or operating in the sanctioning jurisdiction, or (4) prohibit purchases and sale of securities of Chinese firms, among other prohibitions or restrictions***. ***For example, in October 2022, the U.S. Department of Commerce's Bureau of Industry and Security released a broad set of export control measures with respect to China, including new regulations restricting the export to China of advanced computing chips, advanced semiconductors, supercomputer technology, equipment for the manufacturing of advanced semiconductors, and components and technology for the manufacturing in China of certain semiconductor manufacturing equipment***. In October 2023, the U.S. Department of Commerce's Bureau of Industry and Security released additional rules that became effective in November 2023, expanding and strengthening export control measures to further restrict China's access to advanced computing chips and semiconductor manufacturing equipment. Japan and the Netherlands issued similar regulations restricting the export of advanced chip-manufacturing equipment, which further curbed China's and China-based companies' access to chip technologies. The United States and other countries may impose other and more expansive restrictions on the sales of chips or other technologies to China and China-based companies, including us, in the future. Any restrictions on the sales of chips or other technologies that may apply to us could materially and adversely affect Cloud Intelligence Group's ability to offer products and services based on advanced computing chips and perform under existing contracts, and affect our businesses more generally by limiting our ability to upgrade our technological capabilities and to maintain our competitive edge, thereby negatively affecting our results of operations, financial condition and growth potential. On the other hand, in May 2023, the Cyberspace Administration of China stated that certain U.S. memory chip manufacturer posed national security risks and banned the use of its products from key infrastructure projects in China.

In addition, Chinese companies, if targeted under U.S. economic sanctions, may lose access to the U.S. markets and the U.S. financial system, including the ability to use U.S.

dollars to conduct transactions, settle payments or to maintain correspondent accounts with U.S. financial institutions. U.S. entities and individuals may not be permitted to do business with sanctioned companies and persons, and international banks and other companies may as a matter of law and/or policy decide not to engage in transactions with such companies. Moreover, certain reports have suggested that the U.S. government may use its influence to block Chinese financial institutions from using the SWIFT network that enables financial institutions to send and receive information about financial transactions, which may in turn adversely affect the ability of Chinese companies to access international payment, clearance and settlement networks.

These restrictions or sanctions, and similar or more expansive restrictions or sanctions that may be imposed by the United States or other jurisdictions in the future, whether directed against us, our affiliates, including Ant Group, or our business partners, may materially and adversely affect our and our technology partners' abilities to acquire technologies, systems, devices or components that may be critical to our technology infrastructure, service offerings and business operations, and thereby negatively affecting our ability to offer products and services (including those based on advanced computing chips and AI technologies) as well as our ability to continue to enhance our technological capabilities. As a result of heightened restrictions, we and our technology partners may be forced to develop equivalent technologies or components, or obtain equivalent technologies or components from sources outside the United States. We and they may not be able to do so in a timely manner and on commercially favorable or acceptable terms, or at all. These restrictions, sanctions, or other prohibitions could negatively affect our and our technology partners' abilities to recruit research and development talent or conduct technological collaboration with scientists and research institutes in the United States, Europe or other countries, which could significantly harm our competitiveness, as well as increase our compliance costs and risks. These restrictions, sanctions, or other prohibitions could also require us to divest certain of our businesses and assets and restrict our ability to operate in the United States or other jurisdictions. For example, U.S. entities and individuals with whom we have existing contractual or other relationships may be prohibited from continuing to do business with us, including performing their obligations under agreements involving our supply chain, logistics, software development, cloud services and other products and services.

* * *

Our business and results of operations, as well as the trading prices of our ADSs, Shares and/or other securities may be materially and negatively affected by current or future export control or economic and trade sanctions or developments. Export control and economic sanctions laws and regulations are complex and likely subject to frequent changes, and the interpretation and enforcement of the relevant regulations involve substantial uncertainties, which may be driven by political and/or other factors that are out of our control or heightened by national security concerns. The high level of uncertainty relating to potential actions, such as export control measures, sanctions, investment prohibitions and others, and their timing and scope, as well as market rumors or

speculation on such potential actions, could also negatively and materially affect the trading prices of our ADSs, Shares and/or other securities.

Furthermore, if we, any of our expanding network of investee companies, global business partners, joint venture partners or other parties that have collaborative relationships with us or our affiliates, including Ant Group, were to become subject to sanctions or export control restrictions, this might result in significant negative publicity, governmental investigations and reputational harm, as well as losses from impairments or write-offs. Some of such companies, partners and other parties, including some of our investee companies and joint venture partners, have become subject to sanctions or export control restrictions. For example, in connection with the Russia-Ukraine conflict, certain Russian shareholders of our AliExpress Russia joint venture (in which we are a minority shareholder) have become subject to varying degrees of sanctions. There is no assurance that the scope of sanctions will not expand to include AliExpress Russia or us.

***Media reports on alleged violation of export control or economic and trade sanctions laws,*** or on uses of the technologies, systems or innovations that we develop, such as biometrics data analysis and artificial intelligence, ***for purposes which could be perceived as inappropriate or controversial, by us, our clients, business partners, investees or other parties not affiliated with or controlled by us, even on matters not involving us, could damage our reputation and lead to regulatory investigations, fines and penalties against us***. Such fines and penalties may be significant, and if we were publicly named or investigated by any regulator on the basis of suspected or alleged violations of export control or economic and trade sanctions laws and rules, even in situations where the potential amount or fine involved may be relatively small, and even in these instances where we would be cleared of any wrongdoing, our reputation could be significantly harmed. Any of these circumstances may cause the trading prices of our ADSs, Shares and/or other securities to decline significantly, and materially reduce the value of your investment in our ADSs, Shares and/or other securities.

17. The statement ¶ 16 was materially false and/or misleading at the time it was made because it materially understated the risk associated with export control violations, or suspicion of the same harming Alibaba's business. This was due to Alibaba's ongoing relationship with Megaspeed, which is suspected of seeking to illegally import Nvidia chips into China, and whose executive Alice Huang, had an affair with former Nvidia CEO Jensen Huang and is alleged to be a Chinese spy directed to have targeted Jensen Huang. Further, the foregoing presented a material reputational risk for Alibaba, causing the same risk to be understated.

18. On June 26, 2025, Alibaba filed its Annual Report on Form 20-F for the year ended March 31, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report was a signed certifications pursuant to SOX signed by Defendant Wu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19. Attached to the 2025 Annual Report as Exhibit 15.5 was the Hong Kong Annual Report for Fiscal Year 2025 in English (adjusted version) (the "Hong Kong Annual Report").

20. The Hong Kong Annual Report contained the following risk disclosure:

> ***Export control, economic or trade sanctions and a heightened trend towards trade and technology "de-coupling" and "de-risking" could negatively affect our business operations and subject us to regulatory investigations, fines, penalties or other actions and reputational harm, which could materially and adversely affect our competitiveness and business operations, as well as the trading prices of our ADSs, Shares and/or other securities.***
>
> The United Nations and a number of countries and jurisdictions, including China, the United States and the EU, have adopted various export control and economic or trade sanction regimes. In particular, the U.S. government and other governments have increasingly threatened and/or imposed export control, economic, trade and other sanctions, trade embargoes, investment prohibitions or restriction and other heightened regulatory requirements on a number of China-based companies through various entity or sanction lists or other manners for a number of reasons, such as alleged engagement or involvement in sale, procurement, transfer or development of cutting-edge or emerging technologies, "dual-use" commercial technologies, advanced computing chips or in other activities that could be used for surveillance, human rights violations, military or adversarial purposes or otherwise harm or threaten such jurisdictions' national security or interests or in other activities that could be deemed to violate export control regulations. For example, in April 2023, certain U.S. senators called for the imposition of sanctions on Chinese cloud companies, including Alibaba Cloud. It is possible that the United States or other jurisdictions may further impose, or threaten to impose, similar or heightened measures against, including adding to the various entity and sanctions lists, more China-based companies including us for similar or other reasons. ***These regulatory measures and requirements could (1) prohibit or restrict firms from selling, exporting, re-exporting or transferring certain technology, components, software and other items to China-based companies, (2) prohibit or restrict persons from entering into transactions or cooperation with China-based companies, (3) prohibit or restrict China-based companies from acquiring advanced computing chips or related services, accessing, transferring or storing data, providing services in or operating in the sanctioning***

***jurisdiction, (4) prohibit collaborative research in AI and other areas between China and the United States, or (5) prohibit purchases and sale of securities of China-based companies, among other prohibitions or restrictions***. For example, since 2022, the U.S. Department of Commerce's Bureau of Industry and Security has released a series of measures restricting the export to China of advanced computing chips, advanced semiconductors, supercomputer technology, semiconductor manufacturing equipment, and components and technology for the manufacturing in China of certain semiconductor manufacturing equipment. ***In April 2025, U.S. chip company Nvidia disclosed that the U.S. government had imposed export restrictions on its H20 AI chips to China***. Furthermore, the U.S. Department of Commerce's Bureau of Industry and Security, or the BIS, established the AI Diffusion Framework and issued the Foundry Due Diligence Rule in January 2025, imposing a quota on exports of advanced computing items to countries other than the closest U.S. allies and enhancing foundry due diligence requirements. Although the Trump administration rescinded the AI Diffusion Framework in May 2025, it may replace it with similar or more restrictive rules, which could reduce China's access to advanced computing items through third countries. Japan and the Netherlands issued similar regulations restricting the export of advanced chip-manufacturing equipment, which further curbed China's and China-based companies' access to chip technologies. In September 2024, the U.S. House of Representatives passed the Remote Access Security Act, which, if enacted into law, would further restrict China-based companies' access to computing resources of service providers powered by advanced U.S. chips. The United States and other countries may impose other and more expansive restrictions on the supply of chips, computing power or other technologies or services to China and China-based companies, including us, in the future. Any restrictions on the supply of or our access to chips, computing power or other technologies or services that may apply to us or our service providers or business partners could materially and adversely affect Cloud Intelligence Group's ability to offer products and services based on advanced computing chips and computing power, perform under existing contracts and expand its business. Such restrictions also affect our businesses more generally by limiting our ability to upgrade our products and services, technological capabilities, in particular AI technologies, and to maintain our competitive edge, thereby negatively affecting our results of operations, financial condition and growth potential. On the other hand, in May 2023, the Cyberspace Administration of China stated that certain U.S. memory chip manufacturer posed national security risks and banned the use of its products from key infrastructure projects in China.

In addition, China-based companies, if targeted under U.S. economic sanctions, may lose access to the U.S. markets and the U.S. financial system, including the ability to use U.S. dollars to conduct transactions, settle payments or to maintain correspondent accounts with U.S. financial institutions. U.S. entities and individuals may not be permitted to do business with sanctioned companies and persons, and international banks and other companies may as a matter of law and/or policy decide not to engage in transactions with such companies. Moreover, certain reports have suggested that the U.S. government may use its influence to block Chinese financial institutions from using the SWIFT network that enables financial institutions to send and receive information about financial

transactions, which may in turn adversely affect the ability of China-based companies to access international payment, clearance and settlement networks.

These restrictions or sanctions, and similar or more expansive restrictions or sanctions that may be imposed by the United States or other jurisdictions in the future, whether directed against us, our affiliates, including Ant Group, or our service providers or our business partners, may materially and adversely affect our and our technology partners' abilities to acquire technologies, systems, devices, components or computing capacities that may be critical to our technology infrastructure, service offerings and business operations, and thereby negatively affecting our ability to offer products and services (including those based on advanced computing chips and AI technologies) as well as our ability to continue to enhance our technological capabilities. ***As a result of heightened restrictions, we and our technology partners may be forced to develop equivalent technologies or components, or obtain equivalent technologies or components from sources outside the United States. We and they may not be able to do so in a timely manner and on commercially favorable or acceptable terms, or at all*. *These restrictions, sanctions, or other prohibitions could negatively affect our and our technology partners' abilities to recruit and retain research and development talent or conduct technological collaboration with scientists and research institutes in the United States, Europe or other countries, which could significantly harm our competitiveness, as well as increase our compliance costs and risks.*** These restrictions, sanctions, or other prohibitions could also require us to divest certain of our businesses and assets and restrict our ability to operate in the United States or other jurisdictions. For example, U.S. entities and individuals with whom we have existing contractual or other relationships may be prohibited from continuing to do business with us, including performing their obligations under agreements involving our supply chain, logistics, software development, cloud services and other products and services.

*        *        *

Our business and results of operations, as well as the trading prices of our ADSs, Shares and/or other securities may be materially and negatively affected by current or future export control or economic and trade sanctions or developments. ***Export control and economic sanctions laws and regulations are complex and likely subject to frequent changes, and the interpretation and enforcement of the relevant regulations involve substantial uncertainties, which may be driven by political and/or other factors that are out of our control or heightened by national security concerns***. The high level of uncertainty relating to potential actions, such as export control measures, sanctions, investment prohibitions and others, and their timing and scope, as well as market rumors or speculation on such potential actions, could also negatively and materially affect the trading prices of our ADSs, Shares and/or other securities.

Furthermore, we have commercial relationships with companies, partners and other parties, including some of our investee companies and joint venture partners, that are or have become subject to sanctions or export control restrictions. For example, in connection with the Russia-Ukraine conflict, certain Russian shareholders of our AliExpress Russia

joint venture (in which we are a minority shareholder) have become subject to varying degrees of sanctions. Our relationships with such companies, partners and other parties may result in significant negative publicity, regulatory investigations and reputational harm. There is also no assurance that the scope of sanctions will not expand to more of these companies, partners or other parties, including us.

***Media reports on alleged violation of export control or economic and trade sanctions laws, or on uses of the technologies, systems or innovations that we develop, such as biometrics data analysis and artificial intelligence, for purposes which could be perceived as inappropriate or controversial, by us, our clients, business partners, investees or other parties not affiliated with or controlled by us, even on matters not involving us, could damage our reputation and lead to regulatory investigations, fines and penalties against us.*** Such fines and penalties may be significant, and if we were publicly named or investigated by any regulator on the basis of suspected or alleged violations of export control or economic and trade sanctions laws and rules, even in situations where the potential amount or fine involved may be relatively small, and even in these instances where we would be cleared of any wrongdoing, our reputation could be significantly harmed. Any of these circumstances may cause the trading prices of our ADSs, Shares and/or other securities to decline significantly, and materially reduce the value of your investment in our ADSs, Shares and/or other securities.

21. The statement ¶ 20 was materially false and misleading at the time it was made for the reasons stated in ¶ 17.

22. On May 20, 2026, the Company filed with the SEC its Annual Report on Form 20-F for the year ended March 31, 2026 (the "2026 Annual Report"). Attached to the 2026 Annual Report were signed SOX certifications signed by Defendant Wu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

23. The 2026 Annual Report contained the following risk disclosure:

***Export control, economic or trade sanctions and a heightened trend towards trade and technology "de-coupling" and "de-risking" have affected and may have further adverse effects on our business operations and subject us to regulatory investigations, fines, penalties or other actions and reputational harm, which could materially and adversely affect our competitiveness and business operations, as well as the trading prices of our ADSs, Shares and/or other securities.***

The United Nations and a number of countries and jurisdictions, including China, the United States and the EU, have adopted various export control and economic or trade

sanction regimes. In particular, the U.S. government and other governments have increasingly threatened and/or imposed export control, economic, trade and other sanctions, trade embargoes, investment prohibitions or restriction and other heightened regulatory requirements on a number of China-based companies through various entity or sanction lists or other manners for a number of reasons. For example, in February 2026, the U.S. Department of Defense added Alibaba Group to the list of Chinese Military Companies, or the CMC List, but later withdrew the list, and there can be no assurance that Alibaba Group will not be included in the list when it is republished. While designation on the CMC List currently mainly prohibits the U.S. Department of Defense from business dealings with entities on the list and does not yet trigger blocking sanctions, such designation will nevertheless have significant adverse effect on our reputation, supply chain, business operations and the trading prices of our ADSs and Shares, and may also lead to an increased risk that U.S. government may impose more severe sanctions or additional restrictions on the entities on the CMC List. The United States or other countries may further impose, or threaten to impose similar or heightened measures against us and other China-based companies for various aspects of our chip, cloud and AI businesses or other reasons, and such risks may be heightened by geopolitical factors beyond our control. These measures could include adding us to the Entity List or various other restrictive and sanctions lists, regulatory inquiries, investigations, penalties and fines, and restrictions on our business operations. Any such measures could impose more severe restrictions than the CMC List, and materially and adversely affect our business, financial conditions, access to U.S. capital, U.S. listing status, and the trading prices of our ADSs, Shares and/or other securities. Moreover, the relationship with business partners have been affected in the belief that we are to be added to such lists, and we may further lose our suppliers and business partners if we or our subsidiaries are added to the above or similar lists, which could significantly affect our business operations and financial conditions.

***The U.S. government and other governments have and may further impose license requirements and other restrictions on the export of technologies, products and services to China, which could prohibit or restrict China-based companies, including us, from acquiring advanced computing chips, advanced semiconductors, supercomputer technology, semiconductor manufacturing equipment, and components and technology for the manufacturing in China of certain semiconductor manufacturing equipment and chips, and entering into collaborative research in AI and other areas. In particular, since 2022, the U.S. government has implemented a series of measures restricting the export to China of advanced computing chips, advanced semiconductors, supercomputer technology, semiconductor manufacturing equipment, and components and technology for the manufacturing in China of certain semiconductor manufacturing equipment and chips, including export restrictions on advanced computing chips of Nvidia***. In January 2026, the U.S. House of Representatives passed the Remote Access Security Act, which, if enacted into law, would further restrict China-based companies' access to computing resources of service providers powered by advanced U.S. chips. ***The U.S. Department of Commerce has indicated that they are actively discussing a new regulatory framework regarding the export of U.S. AI chips, which could place restrictions on the ability of U.S. cloud service providers and their foreign resellers from providing remote access to advanced AI computing power and***

***restricted high-end chips to Chinese customers***. Legislative proposals to expand the Department of Commerce's Entity List could capture more AI-related services and products, which if enacted could effectively prohibit U.S. partners and allies from supplying critical software and services to China-based companies. Moreover, Japan and the Netherlands issued similar regulations restricting the export of advanced chip-manufacturing equipment, which further curbed China's and China-based companies' access to chip technologies. On the other hand, in May 2023, the Cyberspace Administration of China stated that certain U.S. memory chip manufacturer posed national security risks and banned the use of its products from key infrastructure projects in China. In September 2025, the Cyberspace Administration of China requested Chinese technology companies to halt purchases of certain chips.

***These restrictions or sanctions, and similar or more expansive restrictions or sanctions that may be imposed by the United States or other jurisdictions in the future, whether directed against us, our affiliates, including Ant Group, or our service providers or our business partners, have affected and may have further material adverse effects on our and our technology partners' abilities to acquire technologies, systems, devices, components or computing capacities that are critical to our technology infrastructure, service offerings and business operations, and thereby negatively affecting our ability to offer products and services (including those based on advanced computing chips and AI technologies) as well as our ability to continue to enhance our technological capabilities***. For example, our business partners may be prohibited from or choose not to continue doing business with us, including performing their obligations under agreements involving our supply chain, logistics, software development, cloud services and other products and services. As a result of heightened restrictions, our supply chain has been and may be further disrupted, and our access to critical products and services, such as chips and data center services, have been and may be further negatively affected. We may also suffer financial losses as a result of terminations of business relationship. We and our technology partners are forced to develop equivalent technologies or components, or obtain equivalent technologies or components from sources outside the United States. We and they may not be able to do so in a timely manner and on commercially favorable or acceptable terms, or at all. These restrictions, sanctions, or other prohibitions could negatively affect our and our technology partners' abilities to recruit and retain research and development talent or conduct technological collaboration with scientists and research institutes in the United States, Europe or other countries, which could significantly harm our competitiveness, as well as increase our compliance costs and risks. These restrictions, sanctions, or other prohibitions could also require us to divest certain of our businesses and assets and restrict our ability to operate in the United States or other jurisdictions.

On the other hand, China has also imposed export control restrictions on certain goods, technologies and services, such as dual-use items and rare earths. Some of our technologies could fall within the scope of technologies subject to such export restriction. In addition, according to the PRC Export Control Law, we, our affiliates and business partners may also be required to obtain licenses, permits and governmental approvals to export certain goods, technologies and services. We, as an e-commerce platform, may also need to report suspicious violations related to such exports and are prohibited from

knowingly providing services to export operators engaging in export violations. Non-compliance with these restrictions may result in administrative penalties, including warnings, orders to cease the relevant activity, confiscation of illegal gains and fines. These and additional regulatory restrictions and requirements that may become effective from time to time may increase our compliance burden and affect our ability in expanding to international markets.

In addition, China-based companies, if targeted under U.S. economic sanctions, may lose access to the U.S. markets and the U.S. financial system, including the ability to use U.S. dollars to conduct transactions, settle payments or to maintain correspondent accounts with U.S. financial institutions. U.S. entities and individuals may not be permitted to do business with sanctioned companies and persons, and international banks and other companies may as a matter of law and/or policy decide not to engage in transactions with such companies. Moreover, certain reports have suggested that the U.S. government may use its influence to block Chinese financial institutions from using the SWIFT network that enables financial institutions to send and receive information about financial transactions, which may in turn adversely affect the ability of China-based companies to access international payment, clearance and settlement networks.

Our business and results of operations, as well as the trading prices of our ADSs, Shares and/or other securities may be materially and negatively affected by current or future export control or economic and trade sanctions or developments. Export control and economic sanctions laws and regulations are complex and likely subject to frequent changes, and the interpretation and enforcement of the relevant regulations involve substantial uncertainties, which may be driven by political and/or other factors that are out of our control or heightened by national security concerns. The high level of uncertainty relating to potential actions, such as export control measures, sanctions, investment prohibitions and others, and their timing and scope, as well as market rumors or speculation on such potential actions, could also negatively and materially affect the trading prices of our ADSs, Shares and/or other securities.

Furthermore, we have commercial relationships with companies, partners and other parties, including some of our investee companies and joint venture partners, that are or have become subject to sanctions or export control restrictions. For example, in connection with the Russia-Ukraine conflict, certain Russian shareholders of our AliExpress Russia joint venture (in which we are a minority shareholder) have become subject to varying degrees of sanctions. Our relationships with such companies, partners and other parties may result in significant negative publicity, regulatory investigations and reputational harm. There is also no assurance that the scope of sanctions will not expand to more of these companies, partners or other parties, including us.

***Allegations of violations of export control or economic and trade sanctions laws, or on uses of the technologies, systems or innovations that we develop, such as biometrics data analysis and artificial intelligence, for purposes which could be perceived as inappropriate or controversial, by us, our clients, business partners, investees or other parties not affiliated with or controlled by us, even on matters not involving us, could***

> ***damage our reputation, subject us to significant negative publicity, and lead to regulatory investigations, fines and penalties against us***. Such fines and penalties may be significant, and if we were publicly named or investigated by any regulator on the basis of suspected or alleged violations of export control or economic and trade sanctions laws and rules, even in situations where the potential amount or fine involved may be relatively small, and even in these instances where we would be cleared of any wrongdoing, we would be subject to significant negative publicity and our reputation could be significantly harmed. Any of these circumstances may cause the trading prices of our ADSs, Shares and/or other securities to decline significantly, and materially reduce the value of your investment in our ADSs, Shares and/or other securities.

24. The statement in ¶ 23 was materially false and/or misleading at the time it was made for the reasons stated in ¶ 17.

25. The statements referenced in ¶¶ 19, 20 and 16 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Alibaba maintained a business relationship with Alice Huang and, through her, Megaspeed, which is suspected of smuggling certain hardware to China illegally; (2) Alice Huang is suspected of having served as a Chinese spy, and achieved notoriety after her relationship with Jensen Huang, the former CEO of NVIDIA Corporation, was revealed; (3) the foregoing materially raised the likelihood of reputational damage to Alibaba, as well as the risk that Alibaba would not be able to purchase certain products subject to export control restrictions by the United States; and (4) as a result, Defendants' public statements about Alibaba's business, operations, and prospects were materially false and/or misleading at all relevant times.

**<u>THE TRUTH BEGINS TO EMERGE</u>**

26. On November 9, 2026, the Financial Times published an article entitled "Alleged Chinese spy linked to Nvidia chief pitched AI chip deals to investors". The article, which was updated, stated in part the following:

> ***The woman at the center of the Nvidia spying scandal*** pitched an AI chips deal to China-based investors, touting her ability to secure the US company's coveted GPUs ***and her commercial relationship with Chinese tech giant Alibaba***.
>
> In early 2025, Alice Huang and her business partner Kang Wei sought investment for a south-east Asia data centre project worth several hundred million dollars, according to two investors pitched on the deal.
>
> ***The pair said they had "no problem securing GPUs" as a key pillar of the deal and cited Alibaba as a client of the project, according to one investor present***.
>
> Under current US export controls, it is legal for Chinese companies to lease data centre capacity outside the country, but Chinese ownership of these data centre assets, mostly advanced Nvidia GPUs, is not allowed.
>
> *  *  *
>
> ***[Alice Huang] came under scrutiny when it emerged this month that the US believed Jensen Huang had a romantic relationship with a Chinese woman who had been recruited to Spy for China's Ministry of State Security intelligence agency***.
>
> *  *  *
>
> ***She was briefly registered in 2023 as an executive at Megaspeed, which is under investigation in multiple jurisdictions regarding alleged chip smuggling***. [. . .]
>
> *  *  *
>
> Megaspeed also leaned on its relationship with Alibaba to open doors with investors.
>
> ***Company documents show that Alibaba, via a Singaporean subsidiary called Apex Enterprise Solutions, lent money to Megaspeed, via its Malaysian subsidiary Speedmatrix, in June 2024.***

27. The article further stated the following about Megaspeed's relationship with Alibaba, facilitated through their respective subsidiaries, Speedmatrix and Apex Enterprise Solutions:

> As part of the agreement, Speedmatrix pledged its entire business as collateral for the loan. Throughout 2024, Megaspeed's balance sheet grew from $33mm to $3bn, much of which was based on its subsidiaries' dealings.
>
> ***Alibaba was Megaspeed's anchor customer for its south-east Asia cloud service since the beginning and has remained its largest client, according to two people with***

> ***knowledge of the matter*. *One added that Nvidia first met Megaspeed to discuss potential procurement because the company had shown their leasing contract with Alibaba*.**
>
> ***Alibaba did not immediately respond to a request for comment*.**

28. On this news, Alibaba ADSs fell $4.07 per ADS, or 3.71%, to close at $105.38 on November 9, 2026. The following day, they fell a further $2.66 per ADS, or 2.52%, to close at $102.72 on November 10, 2026.

29. On November 10, 2026, *The New York Times*, further reporting on the issue of Megaspeed's significant links to Alibaba, published an article entitled "The Woman in the Middle of Nvidia's Spy Scandal". Upon information and belief, this article was published after market hours. It stated in part the following about Alice Huang, including the investigations into her activities, as well as how Alibaba became a "dominant customer" of Megaspeed:

> The company also landed a major new customer: the Chinese e-commerce giant Alibaba. Months after its sale to the Singaporean shell company, Megaspeed had created a Malaysian subsidiary, which then pledged its servers and intellectual property to a subsidiary of Alibaba called Apex. ***Alibaba became Megaspeed's dominant customer, according to a person familiar with the business***.
>
> Before long, Ms. Huang's large A.I. chip orders began to attract attention. In late 2024, the U.S. Commerce Department sent an official to inspect a Megaspeed data center and confirm that the Nvidia chips delivered were on site. Some Nvidia equipment was still packed in boxes, raising concerns that it was being shipped in or out and was not installed at the location.
>
> ***That year, Taiwanese authorities began to monitor Ms. Huang's trips to the island at the suggestion of the U.S. government***, a person familiar with the matter said. She entered Taiwan on a Hong Kong passport and made trips beyond her public appearances with Mr. Huang.
>
> * * *
>
> ***Yet trouble was brewing in Singapore, where officials had also been looking into Megaspeed***. The Singaporean government prohibited Ms. Huang from leaving the country and brought her in for questioning in 2025 as part of an investigation into false declaration of imports, according to a person familiar with the investigation.

30. On this news, Alibaba ADSs fell $1.20 per ADS, or 1.16%, to close at $101.52 on

November 11, 2026.

31. On November 12, 2026, before the market opened, Reuters published an article entitled "Chinese AI firms rush to secure Nvidia chip capacity as spy scandal stirs fear of US curbs". The article stated the following in part:

> Chinese AI companies are trying to rent Nvidia-powered computing capacity outside China, worried that the scandal involving the US chipmaker's CEO Jensen Huang ***could spur Washington to tighten restrictions on their remote use of advanced processors, three people familiar with the matter said***.

32. On this news, Alibaba ADSs fell $7.16 per ADS, or 7.05%, to close at $94.36 on November 12, 2026.

33. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the publicly traded securities of the Company during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Company securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

36. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

37. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

40. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Company shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;
- As a public issuer, the Company filed periodic public reports;
- The Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- The Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

41. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Company securities during the Class Period.

47. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

48. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiff and the Class.

49. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Company securities during the Class Period in purchasing

Company securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

50. Had Plaintiff and the other members of the Class been aware that the market price of Company securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

51. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

52. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Company securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendant**

53. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54. During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

55. As officers and/or directors of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

56. Because of their positions of control and authority as senior officers, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendant exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendant, therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

57. By reason of the above conduct, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Plaintiff and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 19, 2026

**THE ROSEN LAW FIRM, P.A.**
/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*